**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| **GULF COAST HEALTH CARE, LLC,** *et al.,* | Case No. 21-11336 (KBO) |
| Debtors. | Jointly Administered |
| **DELTA HEALTH GROUP, LLC, CORDOVA REHAB, LLC,** and **PENSACOLA HEALTH TRUST, LLC** | |
| Plaintiffs, | |
| v. | Adversary No. 22-50061(KBO) |
| **GULF COAST HEALTH CARE, LLC, PENSACOLA ADMINISTRATIVE SERVICES, LLC, GULF COAST MASTER TENANT I, LLC, GULF COAST MASTER TENANT II, LLC, HUD FACILITIES, LLC, GULF COAST FACILITIES, LLC, FLORIDA FACILITIES, LLC, CSE PINE VIEW LLC, CARNEGIE GARDENS LLC, GREENBOUGH, LLC, SUWANEE, LLC, SKYLER MAITLAND LLC, PANAMA CITY NURSING CENTER LLC, CSE MARIANNA HOLDINGS, LLC, DIXIE WHITE HOUSE NURSING HOME, LLC, OCEAN SPRINGS NURSING HOME, LLC, SKYLER BOYINGTON, LLC, SKYLER FLORIDA, LLC, PENSACOLA REAL-ESTATE HOLDINGS, I, LLC, PENSACOLA REAL-ESTATE HOLDINGS II, LLC, PENSACOLA REAL-ESTATE HOLDINGS III, LLC, PENSACOLA REAL-ESTATE HOLDINGS IV, LLC, PENSACOLA REAL-ESTATE HOLDINGS V, LLC, SKYLER PENSACOLA, LLC, OHI ASSET (FL) LAKE PLACID, LLC, OHI ASSET (FL) EUSTIS, LLC,** | |

| | |
|---|---|
| **OHI ASSET (FL) PENSACOLA-HILLVIEW, LLC, OHI ASSET (FL) PENSACOLA, LLC, OHI ASSET (FL) MELBOURNE, LLC, OHI ASSET (FL) PENSACOLA-NINE MILE, LLC, OHI ASSET (FL) LAKE CITY, LLC**, and **NEW ARK CAPITAL, LLC** | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

## OMEGA LANDLORDS' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Defendants CSE Pine View LLC, Carnegie Gardens LLC, Greenbough, LLC, Suwanee, LLC, Skyler Maitland LLC, Panama City Nursing Center LLC, CSE Marianna Holdings, LLC, Dixie White House Nursing Home, LLC, Ocean Springs Nursing Home, LLC, Skyler Boyington, LLC, Skyler Florida, LLC, Pensacola Real-Estate Holdings I, LLC, Pensacola Real-Estate Holdings II, LLC, Pensacola Real-Estate Holdings III, LLC, Pensacola Real-Estate Holdings IV, LLC, Pensacola Real-Estate Holdings V, LLC, Skyler Pensacola, LLC, OHI Asset (FL) Lake Placid, LLC, OHI Asset (FL) Eustis, LLC, OHI Asset (FL) Pensacola-Hillview, LLC, OHI Asset (FL) Pensacola, LLC, OHI Asset (FL) Melbourne, LLC, OHI Asset (FL) Pensacola-Nine Mile, LLC and OHI Asset (FL) Lake City, LLC (collectively, "Omega Landlords") file this Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c), as made applicable to this proceeding by Fed. R. Bankr. P. 7012(b) or, in the alternative, Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, as made applicable to this proceeding by Fed. R. Bankr. P. 7056 (the "Motion").

## I.    INTRODUCTION

1.    This action represents a naked attempt by Delta Health Noteholders,[1] as subordinated

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in Plaintiffs' Amended Complaint ("Complaint") (A.D.I. 25).

creditors, to ignore the terms of written agreements to which they are parties in an attempt to "leapfrog" the undisputed rights of senior creditors. Specifically, Delta Health Noteholders are parties to the Omega Intercreditor Agreement and the Wells Fargo Intercreditor Agreement, each of which preclude, among other things, the filing of this adversary proceeding. Undeterred, Delta Health Noteholders have minted a remarkable legal theory that they are no longer bound by the Omega Intercreditor Agreement because Omega Landlords have "elected remedies" under the Master Lease. Delta Health Noteholders' arguments are legally and factually baseless and should be denied.

2.          First, Delta Health Noteholders and Class 8 Noteholders[2] are barred from challenging stipulations set forth in this Court's Final DIP Order (as defined herein). Specifically, among other stipulations in the Final DIP Order, Debtor Defendants stipulated that they were indebted "to Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $237,711,978 in principal amount of unpaid rent…." Neither Delta Health Noteholders nor Class 8 Noteholders obtained, or even sought, standing to challenge this stipulated fact as required by the Court's Final DIP Order and they are, therefore, bound by such stipulated fact. As such, the claim that Omega Landlords have been indefeasibly paid in full under the Omega Intercreditor Agreement must be denied.

3.          Second, assuming that Delta Health Noteholders and Class 8 Noteholders have the right to challenge amounts owed to Omega Landlords under the Master Lease, the express terms of the Omega Intercreditor Agreement bar the claims of Delta Health Noteholders. Indeed, Delta Health Noteholders must prove both of the following in order to be relieved of the restrictions in the Omega

---

[2] The "Class 8 Noteholders" (which is the Court's desired reference to these parties) are REIT Solutions II, LLC (f/k/a REIT Solutions, Inc.), SJB No. 2, LLC, JJT No. 1, LLC, Wet One, LLC and DLF No. 3, LLC. On February 26, 2022, Omega Landlords timely filed their *Motion to Join Class 8 Noteholders* ("Motion to Join") (A.D.I. 7). Omega Landlords request the relief requested herein against Class 8 Noteholders to the extent that the Court grants the Motion to Join.

Intercreditor Agreement: (a) the Senior Obligations (as defined in the Omega Intercreditor Agreement), including payment of Rent (as defined in the Master Lease), have been indefeasibly paid in full, **and** (b) the Master Lease has terminated. As detailed herein, Delta Health Noteholders cannot establish either prong.

4.      Third, Delta Health Noteholders' claim that they are no longer burdened by the Omega Intercreditor Agreement because Omega Landlords have "elected their remedies" under the Master Lease, is factually and legally without merit. Specifically, Delta Health Noteholders contend that Omega Landlords have "elected their remedies" by terminating the Master Lease and dispossessing Debtor Defendants; however, neither allegation is accurate. The only "remedy elected" by Omega Landlords was the pre-petition acceleration of Base Rent under the Master Lease. Indeed, it was Debtor Defendants, by and through their motion to approve the Facilities Transfer Motion, who sought to reject and terminate the Master Lease, not Omega Landlords. Further, it was Debtor Defendants, not Omega Landlords, who determined, due to lack of liquidity, to dispossess their leasehold interests under the Master Lease.

5.      Additionally, as a matter of law, Delta Health Noteholders' position is barred by the inclusion of an anti-waiver provision in the Master Lease. The law of Florida mandates that where a lease includes an anti-waiver provision pursuant to which it is agreed that all remedies are cumulative and, thereby, the election of one remedy does not preclude another, the doctrine of election of remedies is not applicable.

6.      Finally, the Plan (as defined herein) filed by Debtors includes the terms of a settlement reached among the majority of the constituent parties-in-interest in these chapter 11 cases. Confirmation of the Plan, however, is dependent on the expressed rejection of the relief requested in Delta Health Noteholders' Complaint.

## II.      GOVERNING LAW

a.      Fed. R. Civ. P. 12(c)

7.      A motion under Rule 12(c) is reviewed under the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b). *See Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). The court must accept all factual allegations in a complaint as true and "draw [ ] all reasonable inferences in the plaintiff's favor." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.* 140 F.3d 478, 483 (3d Cir. 1998). The motion can be granted only if no relief could be afforded under any set of facts that could be proved. *Turbe*, 938 F.2d at 428. However, the "court need not credit a complaint's 'bold assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citation omitted). Thus, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). However, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Cir. P. 12(d).

b.      Fed. R. Civ. P. 56

8.      Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993). "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case." *Clark*, 9 F.3d, at 326. "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable

substantive law." *Id.*

9.      "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

10.     Where the movant properly supports its motion, to avoid summary judgment, the nonmoving party must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing ... that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1).

11.     When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must identify those facts of record which would contradict the facts identified by the movant. *See Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir. 2003). Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). On a motion for summary judgment, "the court

need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ.

P. 56(c)(3).

12.       Finally, "at the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Liberty Lobby,* 477 U.S. at 249. "There is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party." *Id.* "If the evidence is

merely colorable … or is not significantly probative, summary judgment may be granted." *Id.* at 249-

50 (internal citations omitted).

## III.      UNDISPUTED FACTS

### a. The Master Lease

13.       Omega Landlords and Debtor Defendant Gulf Coast Master Tenant I, LLC ("Gulf Coast

Tenant") are parties to that certain Second Consolidated Amended and Restated Master Lease

Agreement, dated July 1, 2013, as amended, with regard to twenty-four (24) long term care facilities

(the "Facilities") (the "Master Lease").[3] Importantly:

 a.   The Master Lease is a triple net, integrated, "indivisible and non-severable lease"
      in which Rent[4] is not allocated among the Facilities, and

 b.   Section 5.1.2 provides:

    5.1.2 **Survival of Covenants**. The covenants [Indemnification Obligations] of
    Tenant contained in this section shall **remain in full force and effect after the
    termination of this Lease** until the expiration of the period stated in the applicable
    statute of limitations during which a claim or cause of action may be brought and
    payment in full or the satisfaction of such claim or cause of action and of all expenses
    and charges incurred by Landlord relating to the enforcement of the provisions herein
    specified.

---

[3] The Master Lease is referenced in Delta Health Noteholders' Complaint (A.D.I. 25), ¶ 55, and a true and correct copy
of relevant portions thereof are attached hereto as **Exhibit A**.

[4] "Rent" is defined in the Master Lease as "Base Rent and Additional Rent." *Id.*, p. 12. "Additional Rent" is defined as,
in addition to Base Rent, "all other amounts, liabilities, obligations and impositions which Tenant assumes or agrees to
pay under the Lease, including any fine, penalty, interest, charge and cost…." *Id.*, ¶ 2.3.

*Id.*, ¶ 28 (emphasis added).

    c.  Section 8.8 provides:

> 8.8  <u>Remedies Cumulative</u>. The remedies of Landlord herein are cumulative to and not in lieu of any other remedies available to Landlord at law or in equity. The use of any one remedy shall not be taken to exclude or waive the right to use any other remedy.

### b. The Omega Intercreditor Agreement

14.      Omega Landlords, Debtor Defendants, and Delta Health Noteholders entered into the Omega Intercreditor Agreement as of July 6, 2018. Complaint (A.D.I. 25), ¶ 55; Exhibit A to Complaint. All of Delta Health Noteholders' rights in respect of the Note and Loan Agreement[5] are wholly subordinated to the indefeasible payment in full of the Senior Obligations (as defined below) and termination of the Master Lease. *Id.*, ¶ 7. This subordination includes payments under the Note, the exercise of rights under the Loan Agreement, the right "to receive any money, dividend, or other assets in any proceeding on account of the 'Subordinated Debt'…", and the right to "file any claims, proofs of claims, or other instrument of similar character to enforce the obligations of a [Debtor Defendant] in respect of the Subordinated Debt…." *Id.*, ¶¶ 7, 8. Critically, the term "Senior Obligations" includes more than the payment of Base Rent:

> The term **"Senior Obligations"** means, collectively, any and all payment and other obligations or indebtedness of Borrower or any Affiliate thereof (including without limitation of any Subtenant or Lease Guarantor) to Landlord under, in connection with, or in any way related to the Lease Agreement and the other documents or instrument entered into in connection with the Lease Agreement, which shall include without limitation the Lease Documents. The Senior Obligations shall further include without limitation any and all interest accruing after the commencement of any bankruptcy, insolvency, or similar proceeding with respect to Tenant or any obligor or guarantor of the Senior Obligations whether or not a claim for such post-commencement interest is allowed. All capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Lease Agreement.

---

[5] The Note is referred to as the "Subordinated Debt" in the Omega Intercreditor Agreement. The Loan Agreement is included in the definition of the "Subordinated Loan Documents" in the Omega Intercreditor Agreement.

*Id.*, ¶ 2

15.     In addition, the Omega Intercreditor Agreement further restricts Delta Health

Noteholders as follows:

> 7. Lender [Delta Health Noteholders] will not exercise any rights it may have under the Subordinated Loan Documents or otherwise exercise any rights it may have at law or in equity with respect to the Subordinated Debt or otherwise commence any action or proceeding of any kind against Lease Obligor [Debtor Defendants] to recover all or any part of the Subordinated Debt not paid when due or otherwise accelerate the amount of the Subordinated Debt…unless and until the Senior Obligations shall be indefeasibly paid in full and the obligations of Tenant and its Affiliates under the Lease Agreement and other Lease Documents have terminated. For purposes of clarity, Lender may not sue for payment of or initiate or participate in any suit, action or proceeding with respect to the Subordinated Debt or commence judicial or enforcement action or take any other action whatsoever to collect payments of amounts due by Borrower with respect to the Subordinated Debt…

> 8. This Agreement and the obligations of Lender shall be applicable both before and after the filing of any petition by or against a Lease Obligor under the U.S. Bankruptcy Code or any other state or federal liquidation, conservatorship, bankruptcy, reorganization, rearrangement, or other insolvency proceeding (collectively, a "Bankruptcy Event"), and all references to a Lease Obligor shall be deemed to apply to a trustee for a Lease Obligor and a Lease Obligor as debtor-in-possession. **In the event of any Bankruptcy Event, Lender shall not be entitled to receive any money, dividend or other assets in any such proceeding on account of the Subordinated Debt unless and until the Senior Obligations shall be indefeasibly paid in full (including without limitation interest owing to Landlord after the commencement of a bankruptcy proceeding at the rate specified in the Lease Agreement, whether or not such interest is an allowable claim in such proceeding) and all obligations under the Lease Agreement have terminated.** Lender will at Landlord's request file any claims, proofs of claim, or other instruments of similar character necessary to enforce the obligations of a Lease Obligor in respect of the Subordinated Debt and will hold in trust for Landlord and pay over to Landlord in the same form received, to be applied on the Senior Obligations as determined by Landlord, any and all money, dividends or other assets received in any such proceedings on account of the Subordinated Debt, unless and until the Senior Obligations shall be indefeasibly paid in full (and any Senior Obligations under the Lease Agreement has terminated), including without limitation, interest accruing after the commencement of any bankruptcy, insolvency or similar proceeding with respect to a Lease Obligor, whether or not a claim for such post-commencement interest is allowed. Landlord may as attorney-in-fact for Lender, take such action on behalf of Lender and Lender hereby appoints Landlord as attorney-in-fact for Lender to demand, sue for, collect, and receive any and all

such money, dividends or other assets and give acquittance therefore and to file any claim, proof of claim or other instrument of similar character and to take such other proceedings in Landlord's name or in the name of Lender, as Landlord may deem necessary or advisable for the enforcement of this Agreement. Lender will execute and deliver to Landlord such other and further powers of attorney or other instruments as either reasonably may request in order to accomplish the foregoing.

*Id.,* ¶ ¶ 7, 8 (emphasis added).

### c. Debtor Defendants' Failure to Pay Senior Obligations

16.     Debtor Defendants failed to pay Base Rent (as defined in the Master Lease) for the month of June, 2021. Declaration of M. Benjamin Jones In Support of Chapter 11 Petitions and First Day Pleadings ("<u>Jones Declaration</u>"), dated October 14, 2021 (D.I. 16), ¶ 38.

17.     On August 10, 2021, Omega Landlords accelerated all Base Rent due and owing under the Master Lease, demanded payment of $216,920,493.55, and reserved all other rights and remedies that they may have under the Master Lease. *Id.*, ¶ 39.

18.     Debtor Defendants determined that, due to the deteriorating operating performance of the Facilities, they "should work with their landlords to effectuate the smooth transition of the Facilities, to protect the health and well-being of their residents." *Id.*, ¶ 57.

19.     Left with no alternatives upon being advised by the Debtor Defendants of their intent to dispossess the Facilities through voluntary bankruptcy proceedings, an affiliate of Omega Landlords negotiated and consummated a debtor-in-possession financing arrangement (the "<u>Omega DIP Loan</u>"). *Id.*, ¶ 59-60.

### d. Bankruptcy Proceedings

20.     On October 14, 2021 (the "<u>Petition Date</u>"), Debtor Defendants filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. Complaint, ¶ 43. Other than accelerating the Base Rent owed under the Master Lease (*see* ¶ 17, *supra*), Omega Landlord

exercised none of their other remedies under the Master Lease as of the Petition Date.[6]

21.     On October 14, 2021, Debtor Defendants filed their *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief,* (D.I. 14) ("Debtor Defendants' DIP Motion").

22.     On November 3, 2021, Debtor Defendants filed their Facilities Transfer Motion. In the Facilities Transfer Motion, "the Debtors requested that the Court…(ii) authorize the Debtors to take all actions reasonably necessary or desirable to implement the transactions, including **rejecting and terminating** the Master Lease…." Facilities Transfer Motion (D.I. 166), ¶ 5 (emphasis added).

23.     On November 5, 2021, Class 8 Noteholders filed their objections to (a) *Defendant Debtors' Motion for Entry of Order Approving Assumption of Restructuring Support Agreement* (D.I. 186), and (b) Debtor Defendants' DIP Motion (D.I. 187). Also, on November 11, 2021, Omega Noteholders filed their objection to Defendant Debtors' Facilities Transfer Motion. (D.I. 281). Finally, on November 11, 2021, Class 8 Noteholders filed their proofs of claim in these proceedings. (D.I. 231-1).

24.     On November 21, 2021, the Court entered the Facilities Transfer Order (D.I. 336), in which the Court granted Defendant Debtors' Facilities Transfer Motion and held that "[o]n the License Transfer Date, the Master Lease shall be rejected and terminated effective *nunc pro tunc* to the Petition Date. *Id*., ¶ 12. In addition, in the Facilities Transfer Order, the Court ordered:

---

[6] Indeed, had Omega Landlords exercised their remedy of termination of the Master Lease prior to the Petition Date, Debtor Defendants' leasehold interests in the Facilities would not be property of Debtor Defendants' estates.

The Omega Landlords shall be entitled to request allowance of a rejection damages claim based on such rejection in the amount of $35,904,343, which represents the Omega Landlords' estimated damages capped under Bankruptcy Code section 502(b)(6) (the "**Requested Rejection Damages Claim**"). The Requested Rejection Damages Claim shall be subject to (i) the challenge rights of the Official Committee of Unsecured Creditors set forth in Paragraph 23 of the final DIP financing order and (ii) any objections to the Requested Rejection Damages Claim asserted by REIT Solutions II, LLC (f/k/a REIT Solutions, Inc.), SJB No. 2, LLC, JJT No. 1, LLC, Wet One, LLC, and DLF No. 3, LLC (collectively, the "Noteholder Claimants").

*Id.*

25.     On December 2, 2021, the Court entered its *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief,* (D.I. 491) (the "Final DIP Order"). The DIP Loan Parties (as defined in the Final DIP Order), including Debtor Defendants, stipulated that, "[a]s of the Petition Date, the Omega Master Lease Obligors [including Gulf Coast Tenant] were justly and lawfully indebted and liable to Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $237,711,978 in principal amount of unpaid rent…." *Id.*, ¶ F (ii). This stipulation was binding on all parties in interest (including Delta Health Noteholders and Class 8 Noteholders) unless such "[p]arty in interest (in each case, **to the extent requisite standing is obtained pursuant to an order of this court entered prior to the Challenge Deadline…)**" filed a challenge proceeding by the Challenge Deadline, objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of…the Omega Master Lease obligations…." *Id.*, ¶ 23(a) (emphasis added). The Challenge Deadline was, under these circumstances, January 15, 2022. *Id.*, ¶ 23(d). As of January 15, 2022, neither Class 8 Noteholders nor Delta Health Noteholders sought, much less obtained, standing to file a challenge proceeding.

26.     Pursuant to the Final DIP Order, OHI Asset Funding (DE), LLC ("OHI DIP Lender"), an

affiliate of Omega Landlords, was obligated to fund up to $25 million to the Debtors' estates in connection with, among other things, the operations of the Facilities. (D.I. 491).

27.    On March 1, 2022, Debtor Defendants, among others, filed *Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (D.I. 934) (the "Plan"). Under the Plan, the "Unsecured Claims Cash Amount" is in the approximate amount of $11,250,000.00. *Id.,* §§ 1.95, 1.210. This amount represents a recovery by unsecured claimants in a range of approximately 15%-21%. *See Disclosure Statement with Respect to the Debtor's First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"). (D.I. 935), p.3. Due to the claim cap imposed by Bankruptcy Code section 502(b)(6), the Omega Allowed Unsecured Claim, in the amount of $48,996,764.00, *see* Plan, § 1.154, is a fraction of the nearly $238,000,000.00 stipulated claim of Omega Landlords arising from pre-petition acceleration of Base Rent under the Master Lease. But even the much-diminished Omega Allowed Unsecured Claim far exceeds the Pro Rata Distribution of Unsecured Claims Cash Amount due to Omega Landlords under the Plan. *See* [*Declaration of M. Benjamin Jones In Support of Debtors' Joinder and Statement in Support of Dispositive Motion of Omega Landlords* ("Jones Declaration II"), ¶ 4, Exhibit 1 (filed contemporaneously with Debtor Defendants' motion for summary judgment). As such, Omega Landlords will not be indefeasibly paid in full under the Omega Intercreditor Agreement.

## IV.    ARGUMENT AND AUTHORITIES

A.  *Delta Health Noteholders' Claims Should Be Denied Based Upon The Orders of This Court*

28.    In the Facilities Transfer Order, the Court ordered that Omega Landlords' Requested Damages Claim was **only** subject to challenge by the Official Committee of Unsecured Creditors (the "Committee") and Class 8 Noteholders. Facilities Transfer Order, (D.I. 336), ¶ 12. As Delta Health

Noteholders never sought and, hence, were not afforded the right to challenge the Requested Damages Claim, they are now barred from doing so.

29.     More importantly, perhaps, Delta Health Noteholders and Class 8 Noteholders are bound by the stipulations of fact contained in the Final DIP Order. Those stipulations, include, without limitation, that "[a]s of the Petition Date, the Debtor Defendants were justly and lawfully indebted and liable to Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $237,711,978.00 in principal amount of unpaid rent." Final DIP Order (D.I. 491), ¶ F(ii). The Final DIP Order further provides that in order to challenge any of the stipulations contained therein, a party-in-interest was required to obtain an order of the Court granting standing to file a challenge prior to the Challenge Deadline, which was January 15, 2022. *Id.,* ¶ 23(a). The Final DIP Order expressly provides that absent a successful and timely filed challenge, the stipulation as to monies owed to the Omega Landlords under the Master Lease is binding upon all parties in interest. Delta Health Noteholders and Class 8 Noteholders failed to obtain the requisite standing order and, therefore, are barred from challenging that the Senior Obligations under the Omega Intercreditor Agreement include unpaid Base Rent in the amount of over $237 million. Because there can be no dispute that the Senior Obligations under the Omega Intercreditor Agreement, including payment of the sum owed of $237,711,978.00, will never be indefeasibly paid in full by Defendant Debtors (or their estates),[7] Delta Health Noteholders requested declarations for relief must be denied based upon the Court's prior final, non-appealable rulings, which constitute law of the case.

30.     "Under the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances. The purpose of this doctrine is to promote the 'judicial

---

[7] Based upon the terms of the Plan, the Unsecured Claims Cash Amount will fall millions of dollars short of Omega Landlords' accelerated rent claim (in excess of $200 million) and/or the Omega Allowed Unsecured Claim (in excess of $48 million). Jones Declaration II, ¶ 4, Exhibit 1.

system's interest in finality and in efficient administration….'" *Hayman Cash Register Co. v. Sarokin*, 669 F2d 162, 165 (3d Cir. 1981), (quoting *Todd & Co. Inc. v. S.E.C.*, 637 F.2d 154, 156 (3d Cir. 1980)).

The contours of this settled doctrine were described by the Third Circuit in the following terms:

> In *Arizona v. California*, 460 U.S. 605 (1983), the Supreme Court noted:
>
>> Unlike the more precise requirements of res judicata, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.
>
> *Id.* at 618 (citations omitted). The "[l]aw of the case rules have developed 'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'"

*In re Pharmacy Benefit Managers Antitrust Litigation,* 582 F.3d 432, 439 (3d Cir. 2009) (reversing arbitration order in antitrust case on law-of-the-case grounds) (citations omitted).

31.     It is clear that "the law of the case doctrine does not restrict a court's power but rather governs its exercise of discretion." *Arizona,* 460 U.S. at 619, 103 S.Ct. at 1391. In exercising that discretion, however, courts should "be loathe to [reverse prior rulings] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice." *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron Inc.,* 123 F.3d 111, 116 (3d Cir. 1997) (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988)). In addition to that narrow class of cases where the prior ruling was manifestly unjust, the type of "extraordinary circumstances" that warrant a court's exercising its discretion in favor of reconsidering an issue decided earlier in the course of litigation typically exist only where (1) new evidence is available, or (2) a supervening new law has been announced. *See Pharmacy Benefit Managers,* 582 F.3d at 439 (citing, *Magnesium Elektron,* 123 F.3d at 117).

32.     Based upon the foregoing facts and controlling law, the Delta Health Noteholders' request for the declarations prayed for in the Complaint, including that Omega Landlords' Senior Obligations

have been indefeasibly paid in full, must be denied.

B. *The Express Terms of The Omega Intercreditor Agreement Bars The Claims of The Delta Health Noteholders*

33.      Delta Health Noteholders are not entitled to payments under the Note unless and until (a) the Senior Obligations owed to Omega Landlords are indefeasibly paid in full, **and** (b) the Master Lease is terminated. Omega Intercreditor Agreement, ¶ 7.[8] Delta Health Noteholders cannot prevail on either prong required under the Omega Intercreditor Agreement and, therefore, payments under the Note are deemed subordinated and not entitled to be paid.

### a.   The Senior Obligations Remain Outstanding

34.      There is simply no evidence that the Senior Obligations have been, or ever could be, indefeasibly paid in full. Omega Landlords have numerous claims, some of which overlap, but none of which will be indefeasibly paid in full by Debtor Defendants. First, as stipulated by the Debtor Defendants, Omega Landlords' accelerated Base Rent (as defined in the Master Lease) claim owed under the Master Lease is $216,920,493.55. Jones' Declaration, (D.I. 16), ¶ 39; Final DIP Order (D.I. 491), ¶ F (ii). This amount vastly exceeds the most optimistic estimation of Omega Landlords' (i) Pro Rata Distribution of Unsecured Claims Cash Amount (as defined in the Plan), and (ii) Cash Distribution (as defined in the Plan) received from Delta Health Noteholders under the Omega Intercreditor Agreement (collectively, "Omega Landlords' Cash Distribution"), to be paid to Class 4 Claimants under the Plan. *See* Jones Declaration II, ¶ 4, Exhibit 1. Second, Omega Landlords will never be paid their Requested Rejection Damages Claim by Debtor Defendants, estimated to be in the amount of $35,904,343.00, *see* Facilities Transfer Order (D.I. 336), ¶ 12; *see* ¶ 24, *supra,* as even a

---

[8] Indeed, pursuant to the terms of the Omega Intercreditor Agreement, the Delta Health Noteholders are barred from filing (a) proofs of claim (as Omega Landlords never requested that they do so), and (b) this adversary proceeding. *See* ¶ 15 *supra*; Omega Intercreditor Agreement (Ex. A to Complaint), ¶ ¶ 7, 8.

claim in this greatly-reduced amount vastly exceeds Omega Landlords' Cash Distribution to be paid under the Plan. *See* Jones Declaration II, ¶ 4, Exhibit 1. Third, if the Plan is approved, Omega Landlords are entitled to the Omega Allowed Unsecured Claim in the amount of $48,996,164.00. *See* Plan (D.I. 934, § 1.154). As stated previously, the Omega Allowed Unsecured Claim will also never be indefeasibly paid in full, and far exceeds Omega Landlords' Cash Distribution to be paid under the Plan. *See* Jones Declaration II, ¶ 4, Exhibit 1. Fourth, Omega Landlords have not been paid pre-petition Rent (as defined in the Master Lease) from June 1, 2021, through the Petition Date, or post-petition rent following the Petition Date. Declaration of Daniel J. Booth ("Booth Declaration"),[9] at ¶ 4 (attached hereto as **Exhibit B**). As of the date of this pleading, in addition to Base Rent (and late charges and interest) not paid under the Master Lease, numerous other Senior Obligations have not been paid by Debtor Defendants, requiring Omega Landlords to pay such obligations. *Id.,* ¶ 5. These Senior Obligations include the sums set forth on Schedule 1 to the Booth Declaration. *Id.*[10]

35.        Because it is without dispute that the Senior Obligations, including the stipulated accelerated Base Rent amount of $216,920,493.55 and/or the Omega Allowed Unsecured Claim in the amount of $48,996,164.00, will never be indefeasibly paid in full. As such, enforcement of the terms of the Omega Intercreditor Agreement is required. *See In re PWS Holding Corp.,* 228 F. 3d 224, 243-45 (3d Cir. 2000) (rejecting argument that subordinated noteholders' rights under § 510(a) were violated by confirmation of the plan of reorganization, where the rights would not arise until the senior creditors were paid in full, which was a practical impossibility under the plan where the senior indebtedness far outpaced the enterprise value); *In re Ion Media Networks, Inc.,* 419 B.R. 585, 597-98 (Bankr.S.D.N.Y.

---

[9]  The relief requested herein can be awarded without the need for consideration of the facts contained in the Booth Declaration and, therefore, the reason that this pleading is also submitted as a Rule 12(c) motion.

[10]  These indemnification obligations of Defendant Debtors survive any purported termination of the Master Lease pursuant to section 5.1.2.

2009) (enforcement of subordination agreement required where proposed treatment of senior creditor under the plan would not result in the senior creditor being "paid in full").

### b. The Master Lease Has Not Terminated

36.      Delta Health Noteholders' claim that the Master Lease has terminated is erroneous. First, as of the date of the Complaint and this pleading, Debtor Defendants are still operating the Facilities, and will do so until a License Transfer Date (as defined in the Facilities Transfer Order) occurs as to each Facility. Therefore, the Master Lease has not been rejected and, thus, is not terminated.

37.      Second, even assuming, *arguendo,* that the MOTAs result in a change of ownership, at least one of the Facilities – Panama City Health and Rehabilitation Center – will continue to be operated by Debtor Defendants or, after confirmation of the Plan, the Liquidating Trustee.  *See* Booth Declaration, ¶ 6. Hence, as an integrated, indivisible agreement, the Master Lease will not be terminated even after the occurrence of License Transfer Dates under the various MOTAs.

38.      Based upon the foregoing, there is no evidence that the Master Lease has terminated.

C.   *There Has Been No "Election of Remedies" by Omega Landlords That Relieves Delta Health Noteholders From the Terms of The Omega Intercreditor Agreement*

39.      Delta Health Noteholders do not attempt to argue and, thereby concede the obvious – that the Senior Obligations under the Omega Intercreditor Agreement will not be indefeasibly paid in full. Instead, Delta Health Noteholders have minted a remarkable legal argument: that because Omega Landlords have "elected their remedies" under the Master Lease, the terms of the Omega Intercreditor Agreement are no longer in effect. Specifically, Delta Health Noteholders allege:

> 100. By virtue of the Facilities Transfer Order, the Omega Master Lease is being rejected and terminated, *nunc pro tunc* to the Petition Date.

> 101. In accordance with the Facilities Transfer Order, the Debtor Defendants have surrendered all of their rights and benefits under the Omega Master Lease, including their possessory interest in the Omega Properties.

102.    As a result of the termination of the Omega Master Lease and the surrender of the Omega Properties, the Omega Landlords are now free to sell the Omega Properties on any terms, with all of the benefits of such transaction to be retained by the Omega Entities.

103.    By proceeding with the transactions set forth in the RSA and authorized by the Facilities Transfer Order, the Omega Landlords precluded the Debtor Defendants from selling their leasehold interests in the Omega Properties, proposing a replacement tenant for these properties, or otherwise mitigating their exposure under the Omega Master Lease. By choosing this course of action- seeking to recover and monetize their fee simple interest in the Omega Properties- the Omega Landlords made an election of remedies under Florida law.

Complaint (A.D.I. 25), ¶¶ 100-103.

40.    Under Florida law, the election of remedies doctrine provides that "a party-electing one course of action should not later be allowed to avail himself of an incompatible course." *Barbe v. Villeneuve*. 505 So. 2d 1331, 1332 (Fla. 1987). Florida law, however, provides that the doctrine "applies only where the remedies in question are coexistent and inconsistent." *Id*. Accordingly, "for one remedy to bar another remedy on grounds of inconsistency they must proceed from opposite and irreconcilable claims of right and must be so inconsistent that a party could not logically follow one without renouncing the other." *Id*. (citing *Klondike, Inc. v. Blair*. 211 So. 2d 41, 43 (Fla. Dist. Ct. App. 1968)). "Remedies are inconsistent if they provide double recovery for the same inquiry…or rely on sets of facts that are inconsistent with one another." *F.T.C. v. Leshin*. 719 F.3d 1227, 1232 (11th Cir. 2013).

41.    Where a lease includes an anti-waiver provision pursuant to which it is agreed that all remedies are cumulative and, thereby, the election of one remedy does not preclude another, such anti-waiver language renders the doctrine of election of remedies inapplicable. *See Princeton Homes, Inc. v. Virone,* 2009 WL 10697098, at *4 (S.D.Fla. June 11, 2009) ("[t]he doctrine of election of remedies has no application [here] where the remedies are concurrent or cumulative"); *Heller v Held,* 817 So.

19

2d 1023, 1027 (Fla. Dist. Ct. App. 2002) (same); *see also Goldstein v. Serio,* 566 So.2d 1338, 1339

(Fla. Dist. Ct. App. 1990) (quoting *Security & Inv. Corp. of the Palm Beaches v. Droege,* 529 So. 2d

799 (Fla. Dist. Ct. App. 1998) ("[i]f the remedies are concurrent or cumulative, and logically can

coexist on the same facts, the doctrine of election of remedies does not apply until the injured party has

received full satisfaction for his [or her] injuries…").

42.     The doctrine of election of remedies is not applicable in this proceeding. First, the "only"

remedy elected by Omega Landlords under the Master Lease was their right to accelerate rent. Jones

Declaration. (D.I. 16), ¶ 39; Booth Declaration, ¶ 5. Omega Landlords have exercised no other remedies

afforded to them under the Master Lease. Specifically, contrary to Delta Health Noteholders' bald and

unsupportable allegation(s), it is Debtor Defendants, not Omega Landlords, who moved to reject and

terminate the Master Lease. Specifically, by and through their Facilities Transfer Motion, Debtor

Defendants moved the Court to "[a]uthorize the Debtors to take all actions reasonably necessary or

desirable to implement the transactions, including, **rejecting and terminating the Master Lease.**"

Facilities Transfer Motion (D.I. 166), ¶ 51 (emphasis added).[11] Further, it is undisputed that Omega

Landlords did not "elect" to terminate the Master Lease. Had Omega Landlords exercised the remedy

of termination prior to the Petition Date, operations of the Facilities, by and through Debtor Defendants'

leasehold interests under the Master Lease, would not have been property of the Debtors' estates.[12]

---

[11]  Under the terms of the Master Lease, Debtor Defendants had no right to reject or terminate the Master Lease and/or dispossess themselves of the leasehold premises (absent a landlord event of default). Hence, it is only by virtue of the Bankruptcy Code that Debtor Defendants had the right/option to reject the Master Lease and dispossess themselves of the leasehold premises.

[12] The Third Circuit has ruled that it is a "recognized principle of bankruptcy law that an executory contract or lease validly terminated prior to the institution of bankruptcy proceedings is not resurrected by the filing of the petition in bankruptcy, and cannot therefore be included among the debtor's assets." *Kopelman v. Halvajian (In re Triangle Laboratories, Inc.),* 663 F. 2d 463, 467 (3d Cir. 1981). The Third Circuit, in *Kopelman,* cited *In re Butchman,* 4 B.R. 379, 381 (Bankr.S.D.N.Y. 1980), for the proposition that "[w]hen a debtor's legal and equitable interests in property are terminated prior to the filing of the petition with the Bankruptcy Court that was intended to preserve the debtor's interest in such property, the Bankruptcy Court cannot then cultivate rights where none can grow."

Similarly, Omega Landlords could not have terminated the Master Lease post-petition without seeking an order of the court to lift the automatic stay. *See Blue Diamond Meat Co. v. Grant Food Products, Inc. (In re Grant Food Products, Inc.),* 87 B.R. 6, 8 (Bankr.D.Del. 1988) (a lessor who does not terminate a lease pre-petition cannot thereafter avail itself of such remedy absent obtaining relief from the automatic stay under 11 U.S.C. § 362(a)). Hence, it is frivolous to suggest that Omega Landlords exercised their remedy of termination of the Master Lease.

43.      Second, as it relates to Delta Health Noteholders' equally unsupportable claim that Omega Landlords' elected to dispossess Debtor Defendants from certain of the Facilities, again it was Debtor Defendants, not Omega Landlords, who decided to cease operations and transition to new operators. As admitted by Debtor Defendants (through the Jones Declaration), for a host of reasons, Debtor Defendants did not have sufficient liquidity to continue to operate the Facilities. Jones Declaration (D.I. 16), ¶ ¶ 52-57. Importantly, Debtor Defendants admit that **they** "determined that they should work with their landlords to effectuate the smooth transition of its Facilities…" *Id.,* ¶ 57. Therefore, as with rejection and termination of the Master Lease, dispossession of certain of the Facilities under the Master Lease was **not** pursuant to any conduct or request by any of Omega Landlords, but rather the unilateral action of Debtor Defendants. Omega Landlords are not parties to the MOTAs pursuant to which certain of Debtor Defendants have contracted to dispossess their leasehold interests. Facilities Transfer Order (D.I. 166), Ex. 2. Based upon the foregoing, under Florida law, Omega Landlords have a claim based upon their acceleration of rent pre-petition. *See In re Q-Masters, Inc.,* 135 B.R. 157, 159 (Bankr. S.D. Fla. 1991) ("Because Pineta accelerated the lease, under state law, it would have the right to a claim in excess of $1,300,000.00 for past due rent as well as for the future rent reserved under the lease. Hence, the § 502(b)(6) limitation on the allowable recovery for a landlord's claims based on debtor's breach of a lease is applicable in this case.") The Omega Allowed Unsecured Claim in the amount of

$48,996,164.00 under the Plan simply applies section 502(b)(6) of the Bankruptcy Code to the cap amount of Omega Landlords' pre-petition claim for unpaid rent.

44.     Third, even assuming, *arguendo,* that Omega Landlords did exercise remedies under the Master Lease other than accelerating the rent, under the express terms of the Master Lease, such conduct is not exclusive of the exercise of additional remedies. Specifically, the Master Lease provides:

> 8.8     Remedies Cumulative. The remedies of Landlord herein are cumulative to and not in lieu of any other remedies available to Landlord at law or in equity. The use of any one remedy shall not be taken to exclude or waive the right to use any other remedy.

Ex. A, § 8.8. Based upon applicable law, the above-referenced anti-waiver provision insulates Omega Landlords from Delta Health Noteholders' claim that they have "elected remedies" under the Master Lease.

D.  *Confirmation of The Plan Bars Delta Health Noteholders' Claims*

45.     On March 1, 2022, the Debtors filed their Plan. The Plan terms are the result of, and memorialize, a settlement among the Debtors, New Ark, the Equity Sponsors, the Committee, and the Omega Entities (as those terms are defined in the Plan), Disclosure Statement (D.I. 935), ¶¶ 2-3. While the construct of these cases did not involve or contemplate any contribution from the Omega DIP Lender to settle claims asserted by the Committee on behalf of its constituency, *see* Booth Declaration, ¶ 7, the Omega DIP Lender agreed to contribute potentially several million dollars towards a settlement. *See* Plan, §§ 1.35, 1.141.[13] If confirmed, the Plan provides, among other things:

- A guaranteed recovery by the Class 7A and 7B unsecured creditors of not less than $10,000,000.00;

- A potential recovery of several hundred thousand dollars from the Omega DIP Lender's collateral in the form of outstanding business interruption proceeds

---

[13]  Of course, the Omega Contribution (as defined in the Plan) is in addition to the millions of dollars funded by the Omega DIP Lender, as well as Omega Landlords' absorption of millions of dollars of Debtor Defendants' liability under the Medicare program. Booth Declaration, ¶ 5, fn.2; Schedule 1 thereto.

in favor of the Class 7A and 7B unsecured credits;

- Redirection of funds recovered by Omega Landlords by virtue of its Allowed Unsecured Claim, in the amount of $48,996,164.00, to the Class 7A and 7B unsecured creditors; and

- The establishment of a reserve for the Professional Fee Reserve in the amount of several million dollars.

46.     Confirmation of the Plan is also dependent on, among other things, a ruling denying the relief of Delta Health Noteholders in this action. In other words, for the benefits of the Plan to flow to innocent unsecured creditors, Delta Health Noteholders, who voluntarily signed intercreditor agreements subordinating their debt payments to senior creditors, must be prohibited from improperly "leapfrogging" senior creditors at the expense of the other constituents in these cases.

47.     For these reasons, the Plan seeks to continue to subordinate Delta Health Noteholders in accordance with the terms of written agreements that they each voluntarily signed.[14]

## V.     CONCLUSION

48.     For all of the reasons set forth herein, Omega Landlords request that the Court deny the relief requested by Delta Health Noteholders in their Complaint, thereby ruling[15] that:

(a)  Delta Health Noteholders and Class 8 Noteholders are barred from challenging that Omega Landlords have not been paid accelerated Base Rent under the Master Lease in the amount of $216,920,493.55, and/or the Omega Unsecured Allowed Claim in the amount of $48,996,343.00;

(b)  Omega Landlords' Cash Distribution (as defined in the Motion) in the amount

---

[14] Additionally, the Plan provides for the subordination of any allowed claims of Class 8 Noteholders pursuant to section 509(c) of the Bankruptcy Code because Omega Landlords, as creditors whose claims Class 8 Noteholders have purported to pay partially, will not have those claims paid in full.

[15] Proposed Order attached hereto as **Exhibit C**.

estimated between $5.4+ million and $7.3+ million will not indefeasibly pay in full (i) the stipulated sums owed to Omega Landlords in the amount of $237,711,975.00, (ii) Omega Landlords' accelerated rent claim in the amount of $216,920,493.55, or (iii) Omega Landlords' Allowed Unsecured Claim in the amount of $48,996,164.00;

(c)  The Master Lease has not been terminated;

(d)  Delta Health Noteholders are still bound by the terms of the Omega Intercreditor Agreement;

(e)  Delta Health Noteholders are not free to enforce, vote, and receive distributions based on claims filed in these chapter 11 cases, including without limitation, based upon the Note and Delta Health Noteholders' proofs of claim;

(f)  Class 8 Noteholders are bound by the Court's findings of fact and conclusions of law in this adversary proceeding; and

(g)  Omega Landlords are entitled to such other and further relief as may be deemed just and proper.

Dated: Wilmington, Delaware
       March 22, 2022

**MORRIS, NICHOLS, ARSHT & TUNNEL LLP**

/s/ *Eric D. Schwartz*
Robert J. Dehney (Bar No. 3578)
Eric D. Schwartz (Bar No. 3134)
Daniel B. Butz (Bar No. 4227)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
 Email:    rdehney@morrisnichols.com
              eschwartz@morrisnichols.com
              dbutz@morrisnichols.com

-and-

**WEIL, GOTSHAL & MANGES LLP**

Gary T. Holtzer (admitted *pro hac vice*)
Robert J. Lemons (admitted *pro hac vice*)
Jason L. Hufendick (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10019
Telephone: (212) 310-8000
Email:    Gary.Holtzer@weil.com
          Robert.Lemons@weil.com
          Jason.Hufendick@weil.com

-and-

**FERGUSON BRASWELL FRASER KUBASTA PC**

Leighton Aiken (admitted *pro hac vice)*
2500 Dallas Parkway, Suite 600
Plano, Texas 75093
Telephone: (972) 378-9111
Email:    laiken@fbfk.law

*Counsel for Omega Landlords*